# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NORMAN PONDICK, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO.** ) |
| vs. | ) ) |
| IMPERIAL HOLDINGS, INC., ANTONY MITCHELL, RICHARD A. O'CONNELL, JEROME A. PARSLEY, JONATHAN NEUMAN, DAVID A. BUZEN, FBR CAPITAL MARKETS & CO., JMP SECURITIES LLC and WUNDERLICH SECURITIES, INC., | ) CLASS ACTION COMPLAINT ) ) ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) ) |

Plaintiff, Norman Pondick ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Imperial Holdings, Inc. ("Imperial Holdings" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of Imperial Holdings, who purchased or otherwise acquired Imperial Holdings common stock pursuant or traceable to the Company's February 7, 2011 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      Imperial Holdings is a specialty finance company that focuses on providing premium financing for individual life insurance policies issued by insurance companies, and purchasing structured settlements backed by annuities issued by insurance companies or their affiliates.

3.      On or about February 7, 2011, the Company conducted its IPO.  The IPO was a financial success for the Company and its underwriters, as they raised proceeds of over $189 million by selling over 17.6 million shares of the Company's common stock to investors at a price of $10.75 per share.

4.      On September 27, 2011, the Company shocked investors when it disclosed that the Federal Bureau of Investigation ("FBI") had executed a search warrant, issued by the U.S. Attorney's office in New Hampshire, at Imperial Holdings' offices.  The Company subsequently disclosed that it "understands that it and certain of its employees, *including its chairman and chief executive officer, and its president and chief operating officer*, are under investigation in the District of New Hampshire with respect to its life finance business."  Trading in the Company's stock was halted as a result of this news.  The following day, *all three of the financial firms that had acted as underwriters of the Company's IPO less than eight months earlier downgraded or suspended their coverage of Imperial Holdings.*

5.      Shares of the Company's stock resumed trading on September 28, 2011.  By the close of trading that day, the Company's shares had declined $4.11 per share, or over 65 percent, to close at $2.19 per share, on unusually heavy trading volume.  This closing price on September 28, 2011 represented a cumulative loss of $8.56, or nearly 80 percent, of the value of the Company's stares from the time that they were sold to investors in the IPO less than eight months earlier.

6. The Complaint alleges that the Registration Statement, Prospectus and Prospectus Supplement (collectively, the "Offering Materials") issued in connection with the Company's IPO contained inaccurate statements of material fact, and omitted to state material facts required to be stated, because they failed to disclose that Imperial Holdings had engaged in wrongdoing with respect to its life finance business, which would expose the Company and certain of its executive officers to a federal investigation.

7. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

10. Venue is proper in this District pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, Imperial Holdings maintains its principal executive offices in this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, Norman Pondick, as set forth in the accompanying certification, incorporated by reference herein, purchased Imperial Holdings stock pursuant or traceable to the IPO and has been damaged thereby.

13.     Defendant Imperial Holdings is a Florida corporation with its principal executive offices located at 701 Park of Commerce Boulevard, Suite 301, Boca Raton, Florida.

14.     Defendant Antony Mitchell ("Mitchell") was, at all relevant times, the Company's Chief Executive Officer ("CEO").

15.     Defendant Richard A. O'Connell ("O'Connell") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Chief Credit Officer.

16.     Defendant Jerome A. Parsley ("Parsley") was, at all relevant times, the Company's Director of Finance and Accounting.

17.     Defendant Jonathan Neuman ("Neuman") was, at all relevant times, the Company's President and Chief Operating Officer ("COO").

18.     Defendant David A. Buzen ("Buzen") was, at all relevant times, a member of the Company's Board of Directors.

19.     Defendants Mitchell, O'Connell, Parsley, Neuman and Buzen are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Imperial Holdings' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-

public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

20.     Defendant FBR Capital Markets & Co. ("FBR Capital") was an underwriter of the Company's February 7, 2011 IPO.  FBR Capital maintains its executive offices at 1001 19th Street North, Arlington, Virginia.

21.     Defendant JMP Securities LLC ("JMP Securities") was an underwriter of the Company's February 7, 2011 IPO.  JMP Securities maintains its executive offices at 600 Montgomery Street, Suite 1100, San Francisco, California.

22.     Defendant Wunderlich Securities, Inc. ("Wunderlich") was an underwriter of the Company's February 7, 2011 IPO.  Wunderlich maintains its executive offices at 6000 Poplar Avenue, Suite 150, Memphis, Tennessee.

23.     Defendants FBR Capital, JMP Securities and Wunderlich are collectively referred to hereinafter as the "Underwriter Defendants."  The Underwriter Defendants assisted in the preparation and dissemination of the offering materials for Imperial Holdings' IPO.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Imperial Holdings is a specialty finance company founded in December 2006 with a focus on providing premium financing for individual life insurance policies issued by insurance companies generally rated "A+" or better by Standard & Poor's ("S&P") or "A" or better by A.M. Best Company, and purchasing structured settlements backed by annuities issued by insurance companies or their affiliates generally rated "A1" or better by Moody's Investors Services or "A−" or better by S&P.

25.     In the premium finance business, Imperial Holdings earns revenue from interest charged on loans, loan origination fees, and fees from referring agents.  In the structured settlement business, the Company purchases structured settlements at a discounted rate and sells such assets to (or finances such assets with) third parties.

26.     On or about February 7, 2011, the Company conducted its IPO.  In connection with the IPO, the Company filed its Offering Materials with the SEC.  The IPO was a financial success for the Company and its underwriters, as they raised over $189 million by selling over 17.6 million shares of stock to investors at a price of $10.75 per share.

### Materially False and Misleading
### Statements Made in the Offering Materials

27.     In describing the Company's business, the Offering Materials contained a section entitled "Business Overview" which stated:

> We are a specialty finance company with a focus on providing premium financing for individual life insurance policies and purchasing structured settlements. We manage these operations through two business segments: premium finance and structured settlements. In our premium finance business we earn revenue from interest charged on loans, loan origination fees and agency fees from referring agents. In our structured settlement business, we purchase structured settlements at a discounted rate and sell such assets to, or finance such assets with, third parties.

*       *       *

> We expect that the net proceeds from this offering will be used to finance and grow our premium finance and structured settlement businesses. We intend to originate new premium finance loans without relying on debt financing. We intend to use a portion of the net proceeds from this offering, together with debt financing, to continue to finance the acquisition and sale of structured settlements.

28.     The Offering Materials also provided an overview of the Company's "Premium Finance Business" as follows:

> A premium finance transaction is a transaction in which a life insurance policyholder obtains a loan, predominantly through an irrevocable life insurance trust established by the insured, to pay insurance premiums for a fixed period of

time, allowing a policyholder to maintain coverage under the policy without having to make premium payments during the term of the loan. A premium finance transaction also benefits life insurance agents by preventing a life insurance policy from lapsing, which could require the agent to repay a portion of the commission earned in connection with the issuance of the policy. Since our inception, we have originated premium finance transactions collateralized by life insurance policies with an aggregate death benefit in excess of $4.0 billion.

As of September 30, 2010, the average principal balance of the loans we have originated since inception is approximately $213,000. The life insurance policies that serve as collateral for our premium finance loans are predominately universal life policies that have an average death benefit of approximately $4 million and insure persons over age 65. We currently make loans to borrowers in 9 states with the insureds residing in any of the 50 states.

Our typical premium finance loan is approximately two years in duration and is collateralized by the underlying life insurance policy. We generate revenue from our premium finance business in the form of agency fees from referring agents, interest income and origination fees as follows:

- *Agency Fees* — We charge the referring agent an agency fee for services related to premium finance loans. Agency fees as a percentage of the principal balance of the loans originated during the nine months ended September 30, 2010 and year ended December 31, 2009 were 49.9% and 50.6%, respectively. These agency fees are charged when the loan is funded and collected on average within 47 days thereafter.

- *Interest Income* — Substantially all of the interest rates we charge on our premium finance loans are floating rates that are calculated at the one-month LIBOR rate plus an applicable margin. In addition, our premium finance loans have a floor interest rate and are capped at 16.0% per annum. For loans with floating rates, each month the interest rate is recalculated to equal one-month LIBOR plus the applicable margin, and then, if necessary, adjusted so as to remain at or above the stated floor rate and not to exceed the capped rate of 16.0% per annum. The weighted average per annum interest rate for premium finance loans outstanding as of September 30, 2010 and December 31, 2009 was 11.3% and 10.9%, respectively.

- *Origination Fees* — On each premium finance loan we charge a loan origination fee that is added to the loan and is due upon the date of maturity or upon repayment of the loan. Origination fees as a percentage of the principal balance of the loans originated during the nine ended September 30, 2010 and the year ended December 31, 2009 were 41.7% and 44.7%, respectively.

The policyholder is not required to make any payment on the loan until maturity. At the end of the loan term, the policyholder either repays the loan in full (including all interest and fees) or, defaults under the loan. In the event of default, subject to policy terms and conditions, the borrower typically relinquishes to us

7

control of the policy serving as collateral for the loan, after which we may either seek to sell the policy, hold it for investment, or, if the loan is insured, we are paid a claim equal to the insured value of the policy, which may be equal to or less than the amount we are owed under the loan. As of September 30, 2010, 94.6% of our outstanding loans have collateral whose value is insured. With the net proceeds from this offering, we expect to have the option to retain for investment a number of the policies relinquished to us upon a default. When we choose to retain the policy for investment, we are responsible for all future premium payments needed to keep the policy in effect. We have developed proprietary systems and processes that, among other things, determine the minimum monthly premium outlay required to maintain each retained life insurance policy.

Our premium finance borrowers are currently referred to us through independent insurance agents and brokers licensed under state law. Prior to January 2009, we originated premium finance loans that were sold by life insurance agents that we employed. Once a potential borrower has been referred to us, we assess the borrower's creditworthiness and the fair value of the life insurance policy to serve as collateral. We further support our loan origination efforts with specialized sales teams that guide agents and brokers through the lending process. Our transaction processing and servicing processes and systems allow us to process a high volume of applications while maintaining the ability to structure complex negotiated transactions and apply our strict underwriting standards. Our existing technology infrastructure allows us to service our current loan volume efficiently, and is designed to permit us to service the increased loan volume that we expect to generate with the net proceeds of this offering.

*       *       *

When we approve a premium finance loan, the borrower executes a loan agreement and other related documents, which contain representations, warranties and guaranties from the insured and representations and warranties from the referring agent or broker in regard to the accuracy of the information provided to us and the issuing life insurance company. The funds required to cover all of the premiums due during the term of a premium finance loan are wired up front directly to the borrower. We do not fund loans that are in excess of the premiums previously paid and future premiums that are scheduled to come due on the policy during the term of the loan. In order to determine the amount of premiums previously paid by the borrower so as to be certain we are not advancing more then [*sic*] future and past premiums, we require a statement from the issuing life insurance company showing the amount of prior payments.

29.    Additionally, the Offering Materials further detailed the Company's "Premium Finance Business" as follows:

A premium finance transaction is a transaction in which a life insurance policyholder obtains a loan to pay insurance premiums for a fixed period of time, which allows a policyholder to maintain coverage without additional out-of-

pocket costs. Our typical premium finance loan is approximately two years in duration and is collateralized by the underlying life insurance policy. The life insurance policies that serve as collateral for our premium finance loans are predominately universal life policies that have an average death benefit of approximately $4 million and insure persons over age 65.

We expect that, in the ordinary course of business, a large portion of our borrowers may default on their loans and relinquish beneficial ownership of their life insurance policy to us. Our loans are secured by the underlying life insurance policy and are usually non-recourse to the borrower. If the borrower defaults on the obligation to repay the loan, we generally have no recourse against any assets except for the life insurance policy that collateralizes the loan.

*        *        *

We believe that the net proceeds from this offering will allow us to increase the profitability and number of new premium finance loans by eliminating the cost of debt financing and lender protection insurance and the limitations on loan originations that our lender protection insurance imposed.

30.    The Offering Materials also provided an overview of the Company's "Structured Settlement Business" and stated:

Structured settlements refer to a contract between a plaintiff and defendant whereby the plaintiff agrees to settle a lawsuit (usually a personal injury, product liability or medical malpractice claim) in exchange for periodic payments over time. A defendant's payment obligation with respect to a structured settlement is usually assumed by a casualty insurance company. This payment obligation is then satisfied by the casualty insurer through the purchase of an annuity from a highly rated life insurance company, which provides a high credit quality stream of payments to the plaintiff.

Recipients of structured settlements are permitted to sell their deferred payment streams to a structured settlement purchaser pursuant to state statutes that require certain disclosures, notice to the obligors and state court approval. Through such sales, we purchase a certain number of fixed, scheduled future settlement payments on a discounted basis in exchange for a single lump sum payment, thereby serving the liquidity needs of structured settlement holders.

*        *        *

As of September 30, 2010, we had approximately 50 employees dedicated to the purchase or underwriting of structured settlements. Our purchasing team is trained to work with a prospective client to review the transaction documentation and to assess a client's needs. Our underwriting group is responsible for reviewing all proposed purchases and performing a detailed analysis of the associated documentation. We have also developed a cost-effective nationwide network of

law firms to represent us in the required court approval process for structured settlements. As of September 30, 2010, the average cycle time starting from submission of the paper work to funding the transaction was 70 days. This cycle includes the evaluation and structuring of the transaction, an economic review, pricing and coordination of the court process. Our underwriting procedures and process timeline for structured settlement transactions are described below.

We believe that we have various funding alternatives for the purchase of structured settlements. On September 24, 2010, we entered into an arrangement to provide us up to $50 million to finance the purchase of structured settlements. We also have other parties to whom we have sold settlement assets in the past, and to whom we believe we can sell assets in the future. We will continue to evaluate alternative financing arrangements, which could include securing a warehouse line of credit that would allow us to purchase structured settlements.

31.    Additionally, the Offering Materials detailed the "strict loan underwriting guidelines" and the "extensive underwriting" performed by Imperial Holdings to "help protect against fraud and to seek profitable transactions" as follows:

To help protect against fraud and to seek profitable transactions, we perform extensive underwriting before entering into a transaction. We use strict loan underwriting guidelines that, among other things, require:

- the use of third party medical underwriters to evaluate the medical condition and life expectancy of each insured;

- the use of actuarial tables published by the American Society of Actuaries;

- the subject policy be issued by an insurance company with a high financial strength rating from A.M. Best, Standard & Poor's or other recognized rating agencies;

- a review of each loan for compliance with our internal guidelines as well as applicable laws and regulations; and

- the use of a personal guaranty to further support our underwriting efforts to protect against losses resulting from the issuing insurance company voiding a policy due to fraud or misrepresentations in the application process to obtain the life insurance policy.

We believe that our underwriting guidelines have been effective in mitigating fraud-related risks.

32.    With regard to the Company's "Competitive Strengths," the Offering Materials stated:

We believe our competitive strengths are:

- *Complementary mix of business lines.* Unlike many of our competitors who are focused on either structured settlements or premium financings, we operate in both lines of business. This diversification provides us with a complementary mix of business lines as the revenues generated by our structured settlement business are generally short-term cash receipts in comparison to the revenue from our premium financing business which is collected over time.

- *Scalable and cost-effective infrastructure.* We have created an efficient, cost-effective, scalable infrastructure that complements our businesses. We have developed proprietary systems and models that allow for cost-effective review of both premium finance and structured settlement transactions that utilize underwriting standards and guidelines. Our systems allow us to efficiently process transactions while maintaining our underwriting standards. As a result of our investments in our infrastructure, we have developed a structured settlement business model that we believe has significant scalability to permit our structured settlement business to continue to grow efficiently.

- *Barriers to entry.* We believe that there are significant barriers to entry into the premium financing and structured settlement businesses. With respect to premium finance, obtaining the requisite state licenses and developing a network of referring agents is time intensive and expensive. With respect to structured settlements, the various state regulations require special knowledge as well as a network of attorneys experienced in obtaining court approval of these transactions. Our management and key personnel from our premium finance and structured settlement businesses are experienced in these specialized businesses and, in many cases, have more than half a decade of experience working together at Imperial and at prior employers. Our management team has significant experience operating in this highly regulated industry.

- *Strength and financial commitment of management team with proven track record.* Our senior management team is experienced in the premium finance and structured settlement industries. In the mid-1990s, several members of our management team worked together at Singer Asset Finance, where they were early entrants in structured settlement asset classes. After Singer was acquired in 1997 by Enhance Financial Services Group Inc., several members of our senior management team joined Peach Holdings, Inc. At Peach Holdings, they held senior positions, including Chief Operating Officer, Head of Life Finance and Head of Structured Settlements. In addition, Antony Mitchell, our chief executive officer, and Jonathan Neuman, our president and chief operating officer, each have over $7 million of their own capital invested in our company. This financial commitment aligns the interests of our principal executive officers with those of our shareholders.

11

33.     Finally, with respect to the Company's "Business Strategy," the Offering Materials stated:

> Guided by our experienced management team, with the net proceeds from this offering, we intend to pursue the following strategies in order to increase our revenues and generate net profits:
>
> - *Reduce or eliminate the use of debt financing in our premium finance business.* The capital generated by this offering will enable us to fund new premium finance loans and provide us with the option to retain investments in life insurance policies that we acquire upon relinquishment by our borrowers without the need for additional debt financing. In contrast to our existing leveraged business model that has made us reliant on third-party financing that is often unavailable or expensive, we intend to use equity capital from this offering to engage in premium finance transactions at profit margins significantly greater than what we have historically experienced. In the future, we expect to consider debt financing for our premium finance transactions and structured settlement purchases only if such financing is available on attractive terms.
>
> - *Eliminate the use of lender protection insurance.* With the proceeds of this offering, we will no longer require debt financing and lender protection insurance for new premium finance business. As a result, we expect to experience considerable cost savings, and in addition expect to be able to originate more premium finance loans because we will not be subject to coverage limitations imposed by our lender protection insurer that have reduced the number of loans that we can originate.

34.     The statements contained in ¶¶ 27 – 33 were inaccurate statements of material fact, and omitted to state material facts required to be stated, because they failed to disclose that Imperial Holdings had engaged in wrongdoing with respect to its life finance business, which would expose the Company and certain of its executive officers to a federal investigation.

**The Truth Begins to Emerge**

35.     On September 27, 2011, the FBI executed a search warrant at Imperial Holdings' office and trading in the Company's stock was subsequently halted.   As reported by *The Associated Press*:

> *Imperial Holdings LLC was shut down and trading in its stock halted following an FBI raid at its Boca Raton, Fla., office on Tuesday.*

The FBI searched and closed the office at around 1 p.m. EDT, the Palm Beach Post reported. The newspaper said an empty U-Haul truck was backed up to the entrance at the time of the raid, and workers there were sent home.

***An FBI spokesman in Miami said agents were acting on a search warrant issued by the U.S. Attorney's office in New Hampshire.*** The New Hampshire office would not comment on the investigation.

Trading was halted in the New York Stock Exchange-listed stock at about 1:45 p.m. An NYSE spokesman confirmed the stock was halted pending news, but could not offer any details.  [Emphasis added.]

36.     Also on September 27, 2011, the Company issued a press release confirming that its offices had been searched by the FBI, and disclosing that certain of its executive officers, including its chairman and CEO, and its president and COO, were under federal investigation. The press release stated, in relevant part:

Imperial Holdings, Inc. (NYSE: IFT) ("Imperial") was served today with a search warrant issued by a Magistrate Judge for the U.S. District Court in the Southern District of Florida.

Imperial is a specialty finance company providing liquidity solutions with a focus on individual life insurance policies and purchasing structured settlement payments. ***The Company understands that it and certain of its employees, including its chairman and chief executive officer, and its president and chief operating officer, are under investigation in the District of New Hampshire with respect to its life finance business.***

During the exercise of the warrant the Company fully cooperated. There has been no action taken against the Company's structured settlement business and the Company anticipates normal operations, across all of its business segments, will resume tomorrow.

"Today's action comes as a complete surprise. We are not aware of any wrongdoing and will cooperate fully with all relevant authorities to assist them in their investigation," said Antony Mitchell, chairman and chief executive officer, Imperial Holdings, Inc.  [Emphasis added.]

37.     On September 28, 2011, prior to the market opening for trading, ***all three of the financial firms that had acted as underwriters of the Company's IPO less than eight months earlier downgraded or suspended their coverage of Imperial Holdings***:

    a.      FBR Capital downgraded Imperial Holdings to "Market Perform" from "Outperform" and reduced its price target for the shares from $15.00 per share to $6.20 per share;

    b.      Wunderlich downgraded Imperial Holdings to "Hold" from "Buy" and suspended its price target for the shares; and

    c.      JMP Securities suspended its coverage of Imperial Holdings.

38.     Shares of the Company's stock resumed trading on September 28, 2011.  By the close of trading that day, the Company's shares had declined $4.11 per share, or over 65 percent, to close at $2.19 per share, on unusually heavy trading volume.  This closing price on September 28, 2011 represented a cumulative loss of $8.56, or nearly 80 percent, of the value of the Company's stares from the time that they were sold to investors in the IPO less than eight months earlier.

39.     On October 4, 2011, *The Wall Street Journal* published an article on Imperial Holdings entitled "Life-Policy Loans Under Scrutiny."  The article stated, in relevant part:

> A recent federal raid on a little-known Florida lender has turned up the heat on an obscure corner of the financial world, where life-insurance policies are held as collateral for high-cost loans.
>
> Agents from the Federal Bureau of Investigation and other authorities on Sept. 27 descended upon the offices of Imperial Holdings Inc., a Boca Raton-based firm that makes loans almost exclusively to older people. The loans allow those people to pay six-figure premiums on multimillion-dollar insurance policies, which serve as collateral on the loans.
>
> The purpose of the action wasn't clear but it could represent another legal battleground for investors seeking to buy life-insurance policies in order to collect the benefits once the policyholders die. Imperial's practices already are the subject of a handful of lawsuits from the insurance industry.
>
> \*     \*     \*
>
> Federal and state courts long have upheld consumers' rights to sell their policies to outside investors. What insurers say sets Imperial's business strategy apart from these longstanding policy sales is the role of agents and other commission-

based middlemen in allegedly inducing older people to take out policies with the intent to sell them.

Imperial allows its customers to walk away from their loans—or default—so long as they turn over their policies to the company, according to Imperial's regulatory filings. For loans that matured during 2010, 99% weren't repaid at maturity, up from 85% the year before, a filing states. Once a policy is in default, Imperial can either keep it until the borrower dies or sell it to another investor.

In at least a handful of civil lawsuits in different federal courts, insurers and at least one borrower have accused Imperial of a pivotal role in what they contend is unlawful "stranger-originated life insurance."

Insurers maintain that such policies can violate state laws that prohibit wagering on people's early demise if the policyholders were financially induced to take out the policies specifically for flipping to investors and they themselves didn't pay for the policies.

Imperial typically makes two-year loans of about $213,000 to people at least 65 years old. The debt covers the premiums on a $4 million life-insurance policy, according to the prospectus Imperial filed early this year when it raised $174 million in an initial public stock offering.

Imperial collects revenue from interest income, origination fees charged to its borrowers and fees charged to referring agents. The company charged an interest rate of 14% in the first six months of 2011, a regulatory filing shows. The policyholder isn't required to make any payment on the loan until maturity.

40.     On October 5, 2011, Imperial Holdings disclosed, via a Form 8-K filed with the SEC, that the Company's Board of Directors had "formed a special committee to conduct an independent investigation in connection with the U.S. Attorney's Office for the District of New Hampshire's investigation of the Company's life finance business."

41.     On November 14, 2011, the Company issued a press release entitled "Imperial Holdings, Inc. Announces Third Quarter 2011 Results." Therein, the Company disclosed:

> ***Imperial reported a total loss of $1.8 million for the third quarter of 2011, compared to third quarter 2010 total income of $20.0 million. In the life finance segment, total income decreased by $22.3 million during the third quarter to a total loss of $5.5 million***, compared to total income of $16.8 million for the same period in 2010. ***The decrease was primarily driven by a non-cash, unrealized change in fair value expense of $14.1 million in its investment in life settlements during the third quarter of 2011*** compared to a $3.5 million non-cash unrealized change in fair value gain during the same period in 2010, resulting

from a lower estimated fair value of these Level 3 assets due to a change in the discount rate in the Company's fair value model.

*        *        *

**Government Investigation**

On September 27, 2011, the Company learned of a government investigation of the Company and certain of the Company's employees, including its chairman and chief executive officer and its president and chief operating officer, by the U.S. Attorney's Office for the District of New Hampshire ("government investigation"). *The Company has been informed that the focus of the government investigation concerns its premium finance loan business* and the Company continues to cooperate with the government investigation. There can be no assurances that the ultimate outcome of the investigation will not result in administrative, civil or criminal actions against us or our employees.

Antony Mitchell, Chairman and Chief Executive Officer, commented, *"As a result of the government investigation late in the third quarter we have initiated several internal measures to conserve cash while still being able to maintain our investment in life settlement assets. We made adjustments to account for their estimated fair value in the market today.* We remain committed to preserving our assets and we will curtail cash deployment in life settlements for the remainder of the year." Mr. Mitchell continued, *"We are in the process of reevaluating our premium finance loan business and have suspended the origination of premium finance loans."* [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all those who purchased or otherwise acquired Imperial Holdings' common stock pursuant or traceable to the Company's February 7, 2011 IPO, and who were damaged thereby (the "Class").   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court.  The Company sold over 17 million shares of stock in connection with its IPO, and these shares are owned by thousands of persons.

44.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Securities Act were violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of Imperial Holdings securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

45.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

46.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

47.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM

### Violation of Section 11 of
### The Securities Act Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

49.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's securities pursuant to or traceable to the Offering Materials issued in connection with the Company's February 7, 2011 IPO.

50.     This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Materials and within three years of the effective date of the Offering Materials.

51.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages from the defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violation of Section 12(a)(2) of
### The Securities Act Against The Company and The Underwriter Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

53.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials.

54.     This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CLAIM

### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

56.     The Individual Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Imperial Holdings within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Imperial Holdings to engage in the acts described herein.

57.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    (b)    Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    (d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 14, 2011    **SAXENA WHITE P.A.**

*/s/ Joseph E. White, III*
Christopher S. Jones
Maya Saxena
Joseph E. White III
Lester R. Hooker
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3382

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
D. Seamus Kaskela
skaskela@ktmc.com
David M. Promisloff
dpromisloff@ktmc.com
Adrienne O. Bell
abell@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 14, 2011, I filed the foregoing with the Court's

CM/ECF System, which will send a notice of filing to all registered users.

*/s/ Joseph E. White, III*
Joseph E. White, III
